**Wis.]**          JANUARY TERM, 1893.          381

Brothers and others vs. The Bank of Kaukauna.

BROTHERS, Administrator, and others, Appellants, vs. THE
    BANK OF KAUKAUNA, imp., Respondent.

*February 24 — March 21, 1893.*

*Mortgages: Mental incapacity of mortgagor: Duty of officer taking
    acknowledgment: Bank affected by notice to its cashier: Married
    women: Dower and homestead rights: Estoppel.*

1. Upon the evidence in this case it is *held* that a mortgagor was men-
   tally incompetent to transact any business at the time he and his
   wife executed a mortgage to his son, covering his farm and home-
   stead, and that the facts and circumstances within the knowledge
   of the officer taking the acknowledgment were such that he should
   have made inquiry as to the capacity of the mortgagor.
2. Such officer was the cashier and manager of a bank, and the mort-
   gage and note secured by it became at once, or shortly after, col-
   lateral security for a debt owing by the mortgagee to the bank, and
   further advances were made by the bank to the mortgagee upon
   such security. *Held,* that the bank was chargeable with notice of
   all the facts in relation to the mortgage within the knowledge of
   its cashier, even though he did not acquire such knowledge while
   transacting the business of the bank. The bank cannot, therefore,
   be regarded as a *bona fide* purchaser of the note and mortgage.
3. The mortgage, being invalid because of the mortgagor's incapacity,
   is not binding upon his wife who signed with him, either as to her
   dower or homestead right.
4. The bank, being chargeable with notice of the material facts, cannot
   say that it was misled, and is in no position to insist upon an es-
   toppel by matters *in pais,* or an equitable estoppel, as against the
   mortgagor's wife and a son (not the mortgagee, but a witness to
   the mortgage) who, after his death, seek to have the note and mort-
   gage set aside.
5. The fact that several checks drawn on the bank by the mortgagor
   shortly before the execution of the mortgage, and one drawn there-
   after, were paid by the bank, and a payment afterwards made to
   the bank for the guardian of the mortgagor upon the indebtedness
   of the mortgagee for which the note and mortgage were collateral
   security, are *held* not to estop the plaintiffs from questioning the
   validity of the note and mortgage.

APPEAL from the Circuit Court for *Outagamie* County.
This action was commenced in 1888, by William Hood,

as the general guardian of George W. Kelso, adjudged to be mentally diseased and incompetent, against the *Bank of Kaukauna* and George F. Kelso, son of George W. Kelso, to set aside and cancel a note for the sum of $6,000, purporting to have been made by George W. Kelso October 10, 1885, payable to George F. Kelso or order six years after the date thereof, annual interest at six per cent. per annum, and to be secured by a certain mortgage on certain real estate, being 255 acres of land, the home farm of George W. Kelso, part of which constituted his homestead, executed by said George W. Kelso and *Margaret Kelso*, his wife, to said George F. Kelso, and duly recorded. The complaint charged, in substance, that the note and mortgage were procured without any consideration therefor; that George F. Kelso fraudulently induced, influenced, and persuaded the said George W. Kelso, by false promises and pretense of immediate payment and security, to execute said note and mortgage; and that at the time of the execution thereof, and for a long time prior thereto, the said George W. Kelso was suffering from mental disease and dementia, by reason of which he was wholly incompetent and unfit to transact any business whatever, and was wholly ignorant of the purport and nature of the transaction at the time his signature to said note and mortgage was so secured; that said note and mortgage were afterwards transferred by said George F. Kelso to the defendant bank, and that it, having knowledge of the said dementia and incompetency of the said George W. Kelso, fraudulently connived and colluded with George F. Kelso, by its cashier, F. A. Towsley, influencing, inducing, and persuading said George W. Kelso to execute said note and mortgage, and fraudulently took possession of and held said note and mortgage as collateral security for advances made to said George F. Kelso; that the defendant bank had notice of the manner and purpose for which said note and mortgage

were procured before it had made any advances thereon, and refused to deliver up said note and mortgage to be canceled, and subsequently procured an assignment to be made of said note and mortgage from said George F. Kelso to it, which was duly recorded, and that the said bank claimed to have an interest in said note and mortgage to the amount of $3,800 and interest; that said George F. Kelso is insolvent, and the defendants threaten, intend to, and have advertised to sell at public vendue said note and mortgage.

George W. Kelso died November 11, 1888, leaving *Margaret Kelso*, his widow, and his sons, *William A. Kelso* and George F. Kelso, one of the defendants, as his sole heirs at law. Suggestion of his death was made, and *D. J. Brothers*, as administrator, was substituted as plaintiff in his stead, April 21, 1890. On the 28th of December, 1891, on petition of *Brothers*, as administrator, and of *Margaret Kelso*, widow, and *William A. Kelso*, one of the heirs at law of the deceased, said *Margaret* and *William A.* were joined as parties plaintiff with the administrator, and the complaint was so amended, as the record states, " as to contain the necessary allegations of relationship and of interest of said added parties to George W. Kelso, deceased, December 28, 1891," but the amendments do not appear to have been formally incorporated in the complaint.

After this the defendant bank put in an amended answer, insisting that the mortgage and note in question were duly executed, acknowledged, and delivered by said George W. Kelso and *Margaret*, his wife, and recorded, and that it claims to have an interest in the same to the amount of $5,500, and that it had advertised the note and mortgage for sale to realize the amount due to it thereon, and generally denied each and every allegation in the complaint. It alleges that an assignment of the note and mortgage to the bank was made on or about the 21st of October, 1885, and a subse-

quent assignment thereof May 29, 1886, which was recorded; that the consideration of the assignment was $3,900, actually paid to said George F. Kelso therefor, all of which, with interest, remains due. It denied all knowledge or notice that the note or mortgage was tainted or affected by any of the alleged defects stated in the complaint, or that George W. Kelso was not fully competent to transact and manage said business of the execution thereof; that the acquisition of said note and mortgage by the bank, and payments made thereon, were in good faith, and in the usual and ordinary course of business; and insisted that the plaintiffs were estopped to deny the validity of the note and mortgage by reason of the fact that at the time of the execution of the mortgage plaintiffs *Margaret Kelso* and *William A. Kelso* were present and aided and assisted in the execution and delivery thereof; that said *Margaret* signed the note as one of the makers, and executed and acknowledged the mortgage, and the said *William A. Kelso* signed the same as a witness; that by their own acts, deliberately performed, they gave credence to said note and mortgage, and well knew that they were executed, acknowledged, and delivered to the said George F. Kelso for the purpose of putting them into circulation and obtaining money and credit thereon; that George F. Kelso and wife at the time owned or had an interest in a pulp mill and the business conducted in it, and the note and mortgage were given for the purpose of furthering and bettering the same, and the money received thereon was applied and used in said business with their knowledge and consent; that George F. Kelso subsequently, July 22, 1886, executed and delivered his promissory note for $5,000, secured by a mortgage on the pulp mill, to said George W. Kelso and *Margaret*, his wife. George F. Kelso did not answer.

The insanity or mental incompetency of George W.

Kelso at the time of the execution of the note and mortgage in question does not appear to have been seriously disputed in the circuit court, and was substantially admitted on the argument in this court. His situation and imbecile condition were sustained by the testimony of not less than eight witnesses, and are described by *Margaret Kelso*, whose testimony in that respect is abundantly sustained, substantially as follows: He had a stroke of paralysis in 1879, and an attack every year afterwards. From that time on his mind gradually failed, and as early as 1883 was very much affected. He acted childish, and forgot everything. He tried to look after the farm in 1884. As soon as he saw that anything looked green he wanted to make hay. In the spring of 1885, when he noticed pieplants in the front of the house, he ordered one of his men to cut them out and put them in the barn; that they would make good hay. He ordered one of his men to cut a lot of marsh hay, and load it in the barn, and press it into plug tobacco. In July, 1885, he had the severest paralysis he had had. It made him helpless in body and mind, so that he did not know anything at all. From that time until he died, he could not walk or rise from his chair. He had to be taken care of like a child in every way. He did not have any understanding about anything. He could not converse, only to say a word or so. He had a large rocking chair to sit in. Would not lie in bed. After that stroke he had all sorts of notions. Imagined himself two men, and wanted to bury one. He gave the witness, Glenn, who took care of him at times, orders about digging a grave, and his son *William* to go and get his son George to attend the funeral. He could not feed himself for a time. He had to be fed like a baby. He did not know enough to masticate his food. If anything was put into his mouth he would choke. Would sit with his head on his breast. His condition from June, 1885, to October

grew worse. He never rallied so he could converse or read or talk with anybody. He did not know his own name or that of the boys. When a stranger took him by the hand he would look up to him with a vacant look, and then drop his head. Glenn testified he was not able to let him know when he wanted water or anything. That he had to look and guess at everything, the same as with a child. He would sit in a kind of stupor, and make a kind of purring noise when he wanted to talk. Could not understand him. He did not seem to know what he was doing. Could not walk, and could not talk. He could not help himself in any shape. Did not know witness, nor did he know his wife.

*Margaret Kelso* also testified in respect to the manner in which the note and mortgage were procured. She said that George F. Kelso and F. A. Towsley came to the house to procure the mortgage. Does not remember that they said anything to her husband, only they laid a book on his knee, and laid a paper on it. George F. dipped a pen in ink, and put it in his father's hand, when he signed his name. Then they passed it over to the stand that stood in the other part of the room, and asked her to come. She stated she was so excited she could not, etc. Defendant moved to strike out this statement as not responsive. The motion was granted. Continuing, she said Towsley did not read the note and mortgage to her. There was no paper read. *William A. Kelso,* her son, F. A. Towsley, George W. Kelso, George F. Kelso, and herself were all the persons present. Towsley and George F. were in the room about five minutes. George W.'s condition was so bad he did not understand anything he was doing. Neither Towsley nor George F. Kelso explained the papers signed, that she knows of. She was in the kitchen, doing some work, when Towsley and George F. came out there, and *William A. Kelso* was with his father taking care of him. Being asked

why she signed the note and mortgage, objection was made as incompetent, irrelevant, and immaterial, and was sustained by the court, as also similar objections to the question whether she had any chance to learn what was in the papers when she signed them. Continuing, she testified she did not remember whether George F. Kelso or Towsley asked her to sign, but thinks it was Towsley. She did not look to see what the paper contained. Neither she nor George W. Kelso ever received anything for the note and mortgage. This fact is abundantly established, and is testified to by the son George F., the mortgagee. On cross-examination she said that when Towsley and George F. came to obtain the mortgage, Towsley did not sit down at all. They passed right in. That she did not go with George F. into the room where her husband was, and close the door after her, and have a conversation with him while Towsley remained in the kitchen. When she first went into the room and first saw them, George was holding the paper on his father's knee. George W. Kelso could not raise his hand to his head to feed himself. He could write his name, but not anything else. *William A. Kelso* said that before *George F.* and Towsley came he did not have a talk with George W. That he was not able to talk at that time, or able to understand anything *William* said to him. They were in the room not to exceed fifteen minutes. The mortgage was not read to George W. nor to *Mrs. Kelso*. They did not tell him what those papers contained, any more than the question would be asked if he knew what it was. "I witnessed the instrument simply because I was asked to. There had been no talk by the parties who procured the mortgage about getting the mortgage at this time. They did not talk to me about it. I knew it was a mortgage. That was all I knew about it. Did not take a second thought. I remained in the room with my father until my brother and Towsley went away."

It was proved that Towsley became cashier of the defendant bank in 1883, and continued to be such thereafter, and its general manager. George F. Kelso testified on behalf of the plaintiff that the note and mortgage was deposited with the bank defendant directly after it was obtained, and assigned to them some time later. "Was not assigned at the time it was deposited there. The understanding of the bank was that it was to be placed there as collateral for money I was to get. I had asked Towsley to try to sell it to outside parties, but we had an understanding that it would be collateral to one or two notes we had in there at the time it was taken." James Freeman testified to having stated to Towsley, the cashier, when he came there with a check for payment, that Kelso was wholly incompetent to do business, and that he should have a guardian appointed; and that he, Freeman, would not do any more business with him, and had refused to take a check he tried to write for him, for the reason that he did not know whether he was writing a check or what, and that he could not tell whether he signed it or somebody else. This was on the 12th of June, 1885. He testified to having been there on the 25th of March the same year, and having said to the cashier that Kelso was failing very fast, and was becoming imbecile, and ought to have a guardian. A check was produced from George W. Kelso to Freeman on the bank, bearing the payment stamp of the bank of March 26, 1885. The president and cashier, Towsley, both denied that Freeman made any such statement, but did not deny that he had been in the bank as he claimed.

George F. Kelso, called on behalf of the defendant, testified that he did not remember having any talk with his father and mother about the note and mortgage before its execution. That " there must have been an understanding with them, or we would not have come out to have it exc-

·cuted; but do not remember when it happened.  I do not
think we talked with them that morning before the papers
were executed.  Towsley said to my father, 'Do you un-
derstand the nature of this?' and he assented by a slight
inclination of the head, a *noise* of consent.  I think my father
understood the nature of the business.  His condition was
quite imbecile.  I mean physically."  He testified that the
mortgage executed by him to George W. Kelso and *Mar-
garet Kelso* was not given to secure the note and mortgage
in question, but explained that it was given for other pur-
poses, and to secure his father and mother for what they
·had let him have before that time.  That he did not think
he ever talked it over with his father and mother together
about executing the note and mortgage in question, but
·must have had a conversation with his mother, but did not
remember the conversation, or anything she said.  " I
know when I went to get it I did get it.  I do not know
that I had any conversation with them at all.  Could not
say positively I had any conversation with either of them."

F. A. Towsley, the cashier, testified to going out to
·George W. Kelso's to have the papers executed, at the re-
quest of George F.  That he had no interest in going out
there, and had made no arrangement to have these papers
drafted.  That they went in through the kitchen.  That
George F. and *Margaret Kelso* went into the room adjoin-
ing, and left him sitting in the kitchen.  Were gone prob-
ably five minutes.  The door was closed after them.  " I
heard a noise.  Could not distinguish any of the conversa-
tion.  George F. Kelso came out and told me to come in.
When I came into the room George W. sat in the chair,
and *Margaret Kelso* said to him, 'Father, this is Mr. Tows-
ley.'  He said, 'Yes.'  I said, 'Mr. Kelso, I suppose you
known what I am here for?'  He said, 'Yes.'  I said, 'I
have come out here to have you acknowledge a mortgage.'
Then I read the principal part of it, such as the date, given

to whom, and that it was George W. Kelso and *Margaret Kelso* to George F.; read the description of the property in the mortgage, and the consideration. I asked George W. Kelso if he understood it, and he said 'Yes.' There was a book of some description handed and laid on his lap, pen and ink procured, and this mortgage taken by George F., handed to his father, and he asked him if he understood it, and he said he did. Then he took the pen, dipped it in the ink, and handed it to George W., and he signed his name; and then I took the mortgage and handed it to *Margaret Kelso*, his wife, and asked her to sign it of her free will, and she signed it. I asked them both if it was their free will, and they said 'Yes,' and asked *W. A. Kelso*, who was then in the room, if he understood it, and he assented by signing as one of the witnesses. I witnessed and acknowledged it, and that was all. I handed him the note and said: 'This is the note. Read the note.' He signed it before the pen was handed back to me, and I handed both of them at the same time to *Mrs. Kelso*. *W. A. Kelso* was in the room all the while until I left. I went there on my own behalf. It had nothing to do with the bank business. When we got back I put my notarial seal on the mortgage, and put it into our vault for safe-keeping for George F. Kelso, at his request. October 21st he assigned that mortgage to the bank as collateral to his note for $1,500. After that the bank advanced to George F. Kelso, November 7, 1885, $1,000; November 16, 1885, $500; December 4, 1885, $500; December 17, 1885, $300; April 1, 1887, $100; total, $3,900; which, with interest, amounts to $5,252.32; no part of which has been paid. As we advanced these sums to George F. we took his notes therefor, and in May, 1886, after we had advanced $3,800, another assignment of that mortgage was made to the bank. *W. A. Kelso*, November 23, 1887, paid $68.67 for amount due at the time the indorsements were made on the notes of George F. Kelso,

and directed the receipt to be made to the estate, and it was made that way. He said it was a pretty big load for them to carry, and he did not know how they would be able to carry it. Before all this money had been advanced on account of this note and mortgage, I had not heard and had no knowledge or information that George W. Kelso was incompetent to do business. At the time the note and mortgage were taken, I did not have any knowledge or information or intention of buying or taking them for the bank." He also testified that George W. Kelso had an account with the *Bank of Kaukauna*, and in respect to three checks drawn by him to the order of James Freeman, dated November 12, 1881, May 31, 1882, and May 26, 1884, and in respect to thirty-seven other checks signed by George W. Kelso and drawn on the said bank in favor of divers parties for small sums between the 6th of January, 1885, and the 30th of July of the same year, and paid by the bank, he said a large number of these checks were in the handwriting of *W. A. Kelso*. " I think there was no check presented to our bank and paid by us after May 27th, which had been filled out by George W. Kelso. The date of the last check paid by us is October 14, 1885. That check must have been signed by the same person as the rest. I do not know to whom that check was delivered." Being shown George W. Kelso's bank book, he said: "I find no such entry in that book. It has not been sent in to be balanced up, I should understand from that. I could not say where that check is likely to be. It is not in the bank." The plaintiffs claim that the last check drawn by George W. Kelso was July 30, 1885. Towsley testified that he read part of the mortgage to Kelso, and ".when I asked him if he understood it, he said, ' Yes.' He said nothing further; that is, he used the word ' Yes ' twice. He asked no question. I had no further conversation with him, ex-

cept to ask whether he understood what I had read to him, and if it was his free will to acknowledge it."

The court made no specific finding on the question of competency of George W. Kelso, but found all other questions involved in favor of the defendant, and gave judgment accordingly, from which the plaintiffs appealed.

*John Bottensek*, for the appellants, argued, among other things, that because George W. Kelso and *Margaret Kelso* received no consideration or benefit for or on account of the note and mortgage, and because the bank had notice of the incompetency of George W. Kelso before it advanced anything on account thereof, it cannot now call for a restitution of any money it may have advanced to George F. Kelso, as a condition precedent to the avoidance of the note and mortgage. Any advancement to George F. Kelso was unwarranted and cannot bind George W. Kelso and his heirs or widow. The avoidance of the note and mortgage will place the parties *in statu quo.* 11 Am. & Eng. Ency. of Law, 133; *Crawford v. Scovell,* 94 Pa. St. 48; *Ricketts v. Jolliff,* 62 Miss. 440; *Halley v. Troester,* 72 Mo. 73; *Gibson v. Soper,* 6 Gray, 279; *Hull v. Louth,* 109 Ind. 315; *Alexander v. Haskins,* 68 Iowa, 73; *Rogers v. Blackwell,* 49 Mich. 192; *Hovey v. Hobson,* 53 Me. 451; *Leach v. Leach,* 65 Wis. 284; *Edwards v. Davenport,* 20 Fed. Rep. 756. By signing the note and mortgage with her husband, *Margaret Kelso* could bind her interest in her husband's estate only, and as to that she is bound only as his note and mortgage is binding on him. *Kavanagh v. O'Neill,* 53 Wis. 101; *Haydock Carriage Co. v. Pier,* 74 id. 582; *Fuller & F. Co. v. McHenry,* 83 id. 573; *Edwards v. Davenport,* 20 Fed. Rep. 756; *Munger v. Perkins,* 62 Wis. 499.

For the respondent there was a brief by *H. D. Ryan* and *G. H. Dawson*, attorneys, and *Humphrey Pierce*, of counsel, and oral argument by *Mr. Pierce.* They contended,

*inter alia*, that the plaintiffs by their conduct are estopped to question the validity of the note and mortgage in suit. A party cannot occupy inconsistent positions, and any decisive act of the party, done with knowledge of his rights and of the facts, determines his election and works an estoppel. *Webster v. Phœnix Ins. Co.* 36 Wis. 67; Bigelow, Estoppel (ed. 1872), 578; *Knox v. Clifford*, 38 Wis. 651; *Woodman v. Clapp*, 21 id. 350; *Hopkins v. Joyce*, 78 id. 443; *Godfrey v. Thornton*, 46 id. 690.

PINNEY, J. 1. The evidence establishes beyond doubt or question that George W. Kelso, at the time he signed the note and mortgage in question, was of unsound mind and wholly incapable of conducting the business transaction in question. Extended comment is unnecessary to establish a conclusion so manifest, and against which respondent's counsel were unable to offer serious argument. We have collected the evidence as to the condition of George W. Kelso, and as to what took place at the time the note and mortgage were signed, with the manner of its execution and alleged delivery, because of its important bearing upon the question of notice of his incompetency to the bank defendant. Mr. Towsley, who certified to the acknowledgment of the mortgage, and signed it as a subscribing witness, was, and for some two or three years had been, cashier and general manager of the bank, and it is fair to assume that he possessed the intelligence, quickness of perception, experience, and sound judgment necessary to fit him for his position, and which similar bank officers usually possess. George F. Kelso owned and carried on a pulp mill, and had had dealings with the bank, and was then owing it a considerable sum of money, and in almost desperate financial straits. This note and mortgage were devised as a means of relief, either by selling it, or, it would seem, by using it at the bank; and the claim was made, acquiesced in by

him, as appears from his testimony, that, having been deposited in the bank immediately after its execution, it at once became collateral security for his indebtedness to the bank. Mr. Towsley testifies to going with George F. Kelso to the house of his father, George W. Kelso, with the note and mortgage already prepared, to get them executed, when it appears that George F. Kelso had never exchanged a word with his father in relation to them, and had never talked with him on the subject at all; that he went solely at the request of George F. Kelso, and that it was not a matter in which he personally or the bank had any interest. But the fact is that the bank within less than two weeks advanced, as it is said, $1,500 in money on account of the note and mortgage, and followed it with other sums at short intervals, until the entire advances within about sixty days reached $3,800. The condition of George W. Kelso at the time these papers were signed was quite enough to admonish any intelligent person not to undertake any business transaction with him, for he was a total wreck, mentally as well as physically; and had not as much business capacity as a mere child. It is difficult to understand how, as an acknowledging officer, Mr. Towsley could fairly certify to the acknowledgment of the mortgage. It was for a large sum, and upon the farm and homestead of one deplorably mentally incompetent. Mr. Towsley's testimony in respect to what occurred is in some material points at variance with that of three others who were present, and the fact that he asked *William A. Kelso*, then present, if he understood the transaction, shows at least a consciousness that there was some propriety at least that some one connected with the family, aside from George F. Kelso, should comprehend it. He denies that he then knew or understood that George W. Kelso was mentally incompetent, but he testifies on cross-examination that beyond a slight inclination of his head, and saying "Yes" twice, George

W. Kelso did not say anything; and that he spoke or could speak at all was denied by the others. The situation and the transaction just as it appeared spoke for themselves in a manner not to be misunderstood, and, if Mr. Towsley is now able to say that he did not know or understand that George W. Kelso was a mere imbecile, it is evident that the fault is his own. The facts and circumstances within his knowledge were such as to require him to stay his hand and make that inquiry which would have dispelled any doubt. The testimony of Freeman in this connection is not without weight or consequence, and is corroborated in part by the bank stamp of payment on his check. In view of all the facts and circumstances, which could not fail to have been in Towsley's mind, as they were of such recent occurrence, as cashier of the bank he made the subsequent advances, now amounting, with interest, to over $5,000, for which the bank claims to hold and enforce the mortgage, for which no consideration whatever was ever paid or agreed to be paid to George W. Kelso or his wife.

2. Notice to an agent is notice to his principal, and it is conceded that the principal is bound and affected by such knowledge or notice as his agent obtains in negotiating or attending to the particular transaction. But if the agent acquires his information so recently as to make it incredible that he should have forgotten it, his principal will be bound, although not acquired while transacting the business of the principal. The case of *Walker v. Grand Rapids F. M. Co.* 70 Wis. 92, is a strong case in point to show that the bank when it acquired its interest in the note and mortgage became affected with the notice Towsley had then so recently acquired at the time the papers were executed. This conclusion is supported by *Dresser v. Norwood*, 17 C. B. (N. S.), 466; *The Distilled Spirits*, 11 Wall. 366; *Hovey v. Blanchard*, 13 N. H. 145; *Patten v. Merchants' & F. M. F. Ins. Co.* 40 N. H. 375; *Hart v. F. & M. Bank*, 33 Vt. 252; *Holden v.*

*N. Y. & E. Bank,* 72 N. Y. 286; *Fulton Bank v. N. Y. & S. C. Co.* 4 Paige, 127. Besides, Towsley was the principal financial officer, the real and constant controller and manager of the affairs, of the bank. Indeed, it is not easy to separate him from it, or to consider him other than the bank itself, so fully were the affairs under his management and control. It seems, in view of the particular circumstances, but proper to regard the case in the same manner as if a natural person, as Towsley himself, had acquired the note and mortgage with the knowledge he possessed; and in this connection it is material to observe that it was claimed, supported by George F. Kelso's testimony, that the note and mortgage became immediately on execution collateral security for the debt he then owed the bank. We are therefore of the opinion that the bank is chargeable with notice of all the material facts of which Towsley had notice, and cannot be regarded as a *bona fide* purchaser of the note and mortgage.

3. It is contended that the plaintiffs are estopped from disputing the validity of the note and mortgage in the hands of the bank, and the judgment of the circuit court proceeds upon this ground. There is no ground for saying that either of them is estopped by the mortgage. *William A. Kelso* was not a party to it, and *Margaret Kelso,* the wife of the mortgagor, was not bound by it, either as to her dower or homestead right. If the mortgage did not bind her husband, it did not bind her; and if avoided as to him, it would be avoided as to her as well. Separate and apart from her husband she could not convey or bind by deed or mortgage her dower or homestead right. *Munger v. Perkins,* 62 Wis. 499; *Godfrey v. Thornton,* 46 Wis. 677. As the bank is affected with notice through Towsley, its cashier, of all the material facts, it is in no position to insist upon an estoppel by matter *in pais* or an equitable estoppel as against the plaintiffs. It cannot say that it has

been misled. In order that such an estoppel shall exist, there must generally be some intended deception in the conduct or declaration of the party to be estopped, or such gross negligence on his part as to amount to constructive fraud, by which another has been misled to his injury. *Kingman v. Graham*, 51 Wis. 233; *McLean v. Dow*, 42 Wis. 610; *Brant v. Va. C. & I. Co.* 93 U. S. 326. The fact that prior to the 1st of October, 1885, George W. Kelso signed various small checks ranging from $10 to $50, drawn on the bank, which were paid by it, is a circumstance of little or no weight as against the plaintiffs on the question of estoppel. It is not claimed that but one of these checks was so signed after the execution of the note and mortgage, and the cashier then had notice of facts and circumstances which would have justified him in refusing payment of it. The payment of $68.67 interest on the indebtedness to which the note and mortgage were collateral, by *William A. Kelso*, for George W. Kelso's estate, as appears to have been the fact, was doubtless a payment made for the guardian, Hood, George W. Kelso being then alive. The facts relied on furnish, we think, no ground for holding that the plaintiffs are estopped from disputing the note and mortgage.

For these reasons the judgment of the circuit court is erroneous, and should have been in favor of the plaintiffs and against the defendants.

*By the Court.*— The judgment of the circuit court is reversed, and the cause remanded with directions to enter judgment declaring the note and mortgage in question void, and canceling the same as against the plaintiffs and their right, title, and interest in the lands described.