VENNE, Respondent, vs. DAMROW BROTHERS COMPANY, Appellant.

*February 7—March 8, 1927.*

*Negligence: Improper method of repair of dangerous instrumentality: Knowledge of repair man of intended use of appliance: Knowledge of foreman imputed to employer: Injury to third person: Evidence: Of expert as to safe method of repair: Amount of damages: Instructions as to future damages.*

1. In an action for injuries sustained by the explosion of a high-pressure tank, due to its negligent repair by defendant, knowledge of defendant's agent and foreman of the intended use of the tank and the pressure which it would be called on to withstand is imputed to defendant. p. 254.
2. The evidence in this case is *held* to sustain a finding that defendant was informed of the pressure which the tank would be called on to withstand, and that plaintiff was not chargeable with knowledge that defendant would be likely to be wanting in the skill or equipment necessary to properly repair it. p. 254.
3. Testimony of an expert from another city, in the employ of the manufacturers of the tank, as to the proper manner of repairing such a tank, is admissible. p. 255.
4. Defendant, assuming to repair an instrumentality which by reason of its use may become highly dangerous to others, is charged with the duty of employing a reasonably safe method and doing the work in a reasonably safe manner. p. 256.
5. An award of $10,000 for injuries badly shattering and permanently crippling the right leg of a fifty-five-year-old man engaged as a traveling salesman is *held* not excessive, where his medical expenses were substantial and he had suffered a considerable loss in earnings from the time he was injured until the date of trial. p. 258.

6. An instruction allowing recovery for the physical and mental suffering and the expenses which plaintiff would incur in the future is not prejudicial to defendant, but rather too favorable, in view of the requirement of an *absolute* rather than a *reasonable* certainty of future losses.   p. 259.

Appeal from a judgment of the circuit court for Fond du Lac county: Chester A. Fowler, Circuit Judge. *Affirmed.*

The action is brought to recover damages for personal injuries. The defendant is a domestic corporation located at Fond du Lac, and engaged in the manufacture and repair of dairy appliances. The plaintiff and one Smith were the owners of certain high-pressure tanks, manufactured by a corporation in Chicago known as the Liquid Carbonic Company, and used in the manufacture of root beer. These tanks are about thirty inches in height and fourteen inches in diameter; are cylindrical in shape, and are constructed out of fourteen-gauge steel, and contain an inner lining of block tin. The top of the cylinder consists of a cover, which, when properly placed upon the body of the cylinder, overlaps the same a distance of about three inches. The testimony shows that in order to safely fasten the cover onto the body of the cylinder it becomes necessary to tin the surfaces coming in contact with each other, in order that the solder applied to the contact surfaces may create such an adhesion and union as to withstand high pressure. In order to place the cover in the required position it is pressed down by force to the full extent of the required overlap. The cylinder is then inverted and solder is applied to the rim, and in order that it may permeate all of the contact surfaces a blow-torch is used, which liquifies the solder and causes it to cover such contact surfaces.

When the cylinders were delivered to one Rosenow, the foreman having in charge the repairing department of the defendant, he was informed, according to the testimony of Mr. Smith, that these tanks would be required to withstand

an air pressure of 150 pounds to the square inch. The tanks were left with the defendant for repair, which consisted in placing therein a new inner lining in place of the old. Some time after the work had been completed the tanks were delivered by Rosenow to the plaintiff and Smith, and it was testified to by them that Rosenow's attention was again called to the fact that these tanks were pressure tanks and were required to withstand a pressure of 150 pounds to the square inch, and that Rosenow replied, in substance, that they had been fully tested. A short time after the delivery of the tanks they were used in Oshkosh in a public gathering, for the purpose of manufacturing root beer, and when pressure had been applied to the extent of about 100 or 110 pounds to the square inch, one of these tanks exploded, causing severe injury to the plaintiff.

The case was submitted to the jury on a special verdict, and the jury found, among other things: (1) That the defendant failed to use ordinary care and skill in repairing the container that burst; (2) that such want of ordinary care and skill constituted the proximate cause of plaintiff's injuries; (3) that Mr. Smith did not fail to inform the defendant that the containers would be subjected to a pressure of 150 pounds; and (4) that the plaintiff ought not to have known that the defendant would be likely to be wanting in the skill or equipment necessary to proper repair of the containers.

Upon the usual motions after verdict, the court ordered judgment in plaintiff's favor, and upon the entry thereof the defendant prosecuted this appeal. Further facts will be found in the opinion.

For the appellant there was a brief by *Sutherland, Hughes & Sutherland,* and oral argument by *D. D. Sutherland* and *J. M. Gooding,* all of Fond du Lac.

For the respondent there was a brief by *Reilly & O'Brien* of Fond du Lac, and oral argument by *J. E. O'Brien.*

DOERFLER, J.    These air-pressure tanks were taken by Smith to defendant's factory and left with the foreman, Rosenow, so that they might be taken apart and new inner linings placed therein.    The defendant at that time did not manufacture or repair high-pressure tanks, but was engaged in manufacturing and repairing milk cans and tanks, gasoline tanks, and other similar articles.    Smith testified that Rosenow was fully informed by him, when the tanks were so left for repair, that they were used in the manufacture of root beer, an aerated product, and that they would be required in the process of manufacture of such product to withstand an air pressure of 150 pounds to the square inch. That a cylinder subjected to such an unusual pressure may become a dangerous instrumentality if it is wanting in resisting power, constitutes a fact which requires no argument or explanation.    That such an appliance when subjected to high pressure is no stronger than its weakest point is a well-known physical and scientific fact, which the great mass of mankind is well aware of, and of which courts may and do take judicial notice.    The cylinder itself was constructed of fourteen-gauge steel, which, together with the inner lining, made it a cumbersome and weighty appliance, and which fact, when viewed in the light of the purpose for which it was used, had a tendency to convey to the manufacturer or repairer the idea of great resisting qualities.    To replace an inner lining required a dismemberment of the cylinder; and the removal of the cover exposed to the repairer the full extent of the contact surfaces, which were of the width of about three inches, and also disclosed the method pursued to obtain a safe union by means of the soldering process.    The inner lining was composed of block tin, a substance that will liquefy as readily as the composition used for soldering, on the application of intense heat.

Rosenow knew that if a blow-torch is applied to the rim and the outer surface of the cover, which overlapped the body, the inner lining would be melted and thereby put out

of commission, unless some proper preventive measures were resorted to. When the cover was removed it was ascertained that a layer of asbestos or other paper had been placed between the inner lining and the cylinder proper, and he knew the purpose for which such paper had been so used. That a hollow vessel like the cylinder in question could be filled with water in order to neutralize the intensive heat generated and applied by a blow-torch does not constitute a secret scientific process, but a fact which most persons of ordinary intelligence, and particularly those engaged in manufacturing, like the defendant, can readily be assumed to know; at least, it formed the basis of a logical inference on the part of the jury.

The repair of the cylinder and its replacement in a condition reasonably safe for its use was undertaken by the defendant, with ample opportunity to observe every requirement for a reasonably safe appliance. This knowledge was not only in the possession of the foreman, but of the expert workman who, under the direction and supervision of Rosenow and of Damrow, the president of the company, performed the work. But in order that there might be no misunderstanding with respect to the air pressure that these tanks would be subjected to, Smith, a part owner of these tanks, as the jury found, notified the foreman that these were high-pressure tanks, used in the manufacture of root beer, and that they would be obliged to resist an air pressure of 150 pounds to the square inch. Both the plaintiff and Smith testified that when the tanks were delivered Rosenow's attention was again called to the high pressure of these tanks in the manufacture of root beer, and that in substance Rosenow replied that they were all right and had been tested. If the jury believed this testimony, both Smith and the plaintiff were warranted in inferring that an air-pressure test had been resorted to and that the tanks successfully withstood such test.

Under these facts and circumstances it is argued by de-

fendant's counsel that inasmuch as the plaintiff and Smith did not in express language communicate to Damrow, the president of the company, the degree of pressure to which these tanks would be subjected, the defendant cannot be held liable. Rosenow was the foreman of the defendant in its repair shops. Oberreich was the expert workman. Rosenow obtained all of the knowledge aforesaid as the agent and representative of the defendant in the course of his agency, and it would be an anomalous holding of a court, under these circumstances, to conclude that the knowledge of a foreman was not the knowledge of the defendant. Even if the president of the company was not informed of the high pressure that these tanks were required to resist, the actual construction of the tanks was of such a nature as to warrant a jury to draw a logical inference that a man of Damrow's experience, in view of the business in which his corporation was engaged, ought to have known that these tanks were high-pressure tanks. That the knowledge of the agent under such circumstances is imputed to the principal is held by the following cases and authorities, cited in plaintiff's brief: 21 Ruling Case Law, 838; 2 Corp. Jur. 859–864; *Andrews v. Robertson,* 111 Wis. 334, 87 N. W. 190; *Brothers v. Bank of Kaukauna,* 84 Wis. 381, 54 N. W. 786; *Gano v. C. & N. W. R. Co.* 60 Wis. 12, 17 N. W. 15; *Lukens I. & S. Co. v. Hartmann-Greiling Co.* 169 Wis. 350, 172 N. W. 894; *Sickinger v. Raymond,* 178 Wis. 439, 190 N. W. 93; *Voell v. Klein,* 184 Wis. 620, 200 N. W. 364.

There was ample evidence in the case to sustain the answers of the jury wherein it found that Smith did not fail to inform the defendant that the containers would be subjected to a pressure of 150 pounds to the square inch, and that the plaintiff ought not to have known that the defendant would be likely to be wanting in the skill or equipment necessary to properly repair the containers. The argument of defendant's counsel to the contrary therefore falls.

During the trial the court permitted an expert from Chi-. cago to testify that, in order to properly replace and fasten the cover after the inner lining had been completed, it would be necessary first to insert between the steel tank proper and the inner lining a nonconductor of heat, such as asbestos or other paper; that in order to prevent the inner lining from melting, water should be inserted in the cylinder, in order to neutralize the heat applied by means of the blow-torch. He also testified that the mere application of solder to the seam is ineffectual, and that such application with the aid of a soldering iron would not sufficiently liquify the solder so as to cause it to permeate the entire contact surfaces; that an inspection of the contact surfaces after the explosion clearly disclosed that the solder had not permeated the contact surfaces, but that it did little more than close up the seam. In other words, this testimony was directed specifically to the unsafe method pursued. He also testified that the method in vogue at the plant where he was employed, which is owned by the Liquid Carbonic Company, the manufacturer of these cylinders, is a reasonably safe method to produce a union between the cover and the body of the tank, and that the method employed by defendant was not a reasonably safe method. This testimony was largely admitted over the objection of defendant's counsel. It was argued that the method employed in Chicago was unknown to the defendant, and that there was no standard method in vogue in the vicinity of Fond du Lac; and that therefore the court erred in admitting this testimony.

It appears to us that this expert testimony contained strong probative force, and that it was clearly explanatory of the reason why the work performed by the defendant was unsafe and defective. Having assumed to perform the work on an instrumentality which by reason of its use might become highly dangerous to others, the defendant became charged with the duty of employing a reasonably safe method

and to do the work in a reasonably safe manner. This obligation the defendant would be charged with whether he conducted his business in Chicago or in Fond du Lac or elsewhere. The job undertaken did not require knowledge of secret or patented processes, or such as can only be acquired by scientific experiments or research, but was one which the ordinary mechanic engaged in a business like the defendant can readily be assumed to know. The defendant cannot plead ignorance of a reasonably safe method when he is employed in the performance of work in the repair of an appliance which by reason of its use may become imminently dangerous to others. It has therefore been held in the case of *Coakley v. Prentiss-Wabers Stove Co.* 182 Wis. 94, 195 N. W. 388, that the manufacturer under the circumstances herein detailed is chargeable with knowledge of an unsafe method of manufacture, and that the negligence of the manufacturer under such circumstances must be deemed patent to him, and may be latent to the purchaser. The *Coakley Case* in its facts is very similar to the instant case, and the law as declared in the *Coakley Case* is applicable to the case at bar.

This action, as was held by the trial court, is not one for the recovery of damages for breach of contract, but sounds in tort, and the tort consists of negligence in performing a repair job on the cylinder in question in an unsafe manner, with full knowledge of the danger to third persons when the instrumentality is used for the purpose for which it is designed.

The jury assessed plaintiff's damages at $10,000, and it is argued by defendant's counsel that the amount awarded is excessive. Dr. Clarke, one of plaintiff's experts, testified in substance that plaintiff's right leg from the knee down was very much shattered from external violence and that plaintiff suffered a severe shock; that there was a long, ragged cut across the knee, severing the patella tendon; that he could feel through the wound a loose piece of the bone in the joint; that plaintiff also had a fracture extending downward over

the joint to the big bone, and down to about the junction with the lower third of the limb; and that there was also a compound fracture of the smaller bone. There were also many small puncture wounds, and a big cut and bruise across the instep, and some cuts about his face and head. He was in great pain and bleeding, but was conscious. The plaintiff was put under an anesthetic; the knee joint was opened; the fragments of bone from the joint were removed; the fracture in the leg below was reduced, and the limb was placed in a splint. The wounds had to be dressed daily at the hospital for eleven weeks, during which time the doctor called twice a day. The injury repaired slowly, due to the infections in the wound. Suspension weights were attached to the limb to overcome the deformity, but could not be maintained. When the infection ceased, the leg was put into a plaster cast. The plaintiff could not stand very much weight or pull on the leg, because of intense pain and suffering. For several weeks there was continuous discharge from the wound. At the end of eleven weeks all the wounds excepting two were healed, one on the bottom of the heel and one on top of the foot. The bones were united, but not solid.

During the trial the doctor also examined the limb, and he testified that neither the leg nor the knee was in good condition. The knee is somewhat ankylosed. The knee is not entirely stiff, but the plaintiff has only about forty per cent. of useful motion. In the injured ankle there is about twenty per cent. motion, and there is a loss of one hundred per cent. in the motion of the small bones of the foot. The large toe is quite ankylosed. There are adhesions of the tendons. At the point of the fracture there is an overriding of the bone, resulting in a shortening of the limb to the extent of an inch. He further testified that as to the future the injury is permanent, and that there would be no change in the knee; that there will be some improvement in the ankle.

Dr. J. W. Helz, a medical expert, testified that in the month of August, 1925, he, in conjunction with Dr. Gavin,

cut the tendon Achilles, in order to release the tension, and his foot was thereby brought to a right angle with the leg. That before that it was dropped down, forward; that there is a complete ankylosis of the entire foot except the little toe; that all joints are stiff. That plaintiff has never been able to go without crutches; that he has about thirty or forty per cent. motion left in the knee, twenty per cent. in the ankle, and no motion in the foot; that this loss is permanent; that he will never be able to bear his weight on the injured limb and walk about and balance himself; that he will have to use a crutch or cane. This testimony is further corroborated by the testimony of Dr. Gavin.

Plaintiff at the time of the injury was a married man fifty-five years of age. Before the injury his limb was perfectly normal. He was a traveling salesman, and operated concession stands as a side line. At the time of the injury he was earning about $1,200 a year. The hospital and doctors' bills amounted to about $400, and his loss of earnings up to the time of the trial amounted to several thousand dollars.

The trial court did not deem the amount awarded as excessive. The court and jury were in a better position to adjudge the extent of the injuries and their nature than is this court, which is confined in its consideration of the matter solely to the cold record. Under these circumstances, we agree with the conclusion of the trial court, and hold that the award must stand.

Defendant's counsel assign as error the following instruction of the court to the jury:

"The plaintiff is entitled to recover, if he is entitled to recover at all, such sum as will reasonably and fairly compensate him for all the injuries resulting to him from the explosion. The items to consider and allow for are the physical suffering his physical injuries have caused him up to this time and such as he will suffer in the future from such cause; such mental suffering as his crippled condition

has caused and will cause in the future if such you find; the expense he was put to for physicians' and nurses' services in caring for his injuries; his hospital expenses; and his loss of earnings up to this time and such as it appears to you he will lose in the future as the result of his injuries."

It is argued by defendant's counsel that "The jury should have been limited in assessing damages for future suffering, mental and physical, to such loss in that regard as the evidence satisfies them would be reasonably certain to result from the injury."

The language above quoted is taken from the opinion in the case of *Howard v. Beldenville L. Co.* 129 Wis. 98, 108 N. W. 48. The rule as laid down in the *Howard Case* is one which has been repeatedly approved by this court, and we deem the standard of this rule safer and more satisfactory than the one adopted. In the instruction given, the jury in assessing damages for future pain and suffering was limited to such as the plaintiff will suffer from the causes therein referred to. Such instruction, therefore, is not confined to a showing based upon a *reasonable* certainty, but an *absolute* certainty. In other words, the error committed, if any, rather works in defendant's favor than to its detriment. However, we cannot say from the evidence in the case that prejudicial error was committed. The medical experts testified that there was a permanent injury to plaintiff's limb, as shown by their detailed testimony. A shortening of the limb constitutes a permanent injury which contains no element whatsoever of speculation. This is also true as to the partial loss of motion to the knee joint and the ankle, and the total loss of motion in the foot. It is also established that the plaintiff will never be able to bear the weight of his body upon the injured limb without the aid of a crutch or cane; nor will he be able to balance himself without such aid. In fact, most of the injuries are as permanent in their nature as an injury which required the amputation of the limb.

Other errors assigned, in view of the law as herein held, require no treatment.

So that we must and do conclude, under all the facts and circumstances in the case, that no prejudicial error was committed in giving the instructions complained of in the instant case.

The judgment of the lower court must therefore be affirmed.

*By the Court.*—It is so ordered.